

# ELECTRONIC FRONTIER FOUNDATION
### DEFENDING YOUR RIGHTS IN THE DIGITAL WORLD

HOME | ABOUT | OUR WORK | DEEPLINKS BLOG | PRESS ROOM | TAKE ACTION | SHOP

MARCH 30, 2010 | BY FRED VON LOHMANN

## 50,000 New Lawsuits Against Movie Downloaders

According to The Hollywood Reporter, a group known as the "U.S. Copyright Group" has quietly targeted 20,000 Bit Torrent users for legal action in federal court in Washington, DC. The targets are accused of having downloaded independent films, including "Steam Experiment," "Far Cry," "Uncross the Stars," "Gray Man" and "Call of the Wild 3D," without authorization. The group plans to target 30,000 more individuals for legal action in the coming months.

This time, the lawyers involved are being explicit about their motivations: it's all about the money. "We're creating a revenue stream and monetizing the equivalent of an alternative distribution channel," said one of the attorneys involved. The cases are taken on a contingency basis, designed so that quick settlements will prove lucrative for both the firm and the copyright owners involved.

The attorneys involved are reportedly relying on technology provided by Guardaley IT that claims to enable real-time monitoring of movie downloads on torrents. The IP addresses and information gathered using this technology are then used to file "John Doe" lawsuits and issue subpoenas to ISPs seeking the names and addresses of subscribers associated with those IP addresses. Settlement demands are then sent.

This is not the first time we've seen mass litigation (a.k.a. "spam-igation") used as a profit-center—DirecTV pioneered that tactic by sending demand letters to more than 170,000 Americans accused of satellite piracy. And the major record labels followed up by targeting more than 30,000 people for legal actions between 2003-08.

If this story is correct, it's the latest evidence that copyright law has become unmoored from its foundations. Copyright should help creators get adequately compensated for their efforts. Copyright should not line the pockets of copyright trolls intent on shaking down individuals for fast settlements a thousand at a time.

Intellectual Property | File Sharing | Copyright Trolls

### Related Cases
USCG v. The People

**MORE DEEPLINKS POSTS LIKE THIS**

MAY 2010
EFF Seeks Attorneys to Help Alleged Movie Downloaders

NOVEMBER 2011
Celebrating 50,000 Twitter Followers

**RECENT DEEPLINKS POSTS**

MAY 2, 2012
EFF Asks FCC to Forbid Cell Phone Shutdowns in Wake of 2011 BART Incident

MAY 2, 2012
Time to Make Warrantless Home Video Surveillance Extinct



Donate to EFF

Join EFF

**Stay in Touch**

Email Address

Zip Code (optional)

Sign Up Now

**Follow EFF**

EFF's @RaineyReitman goes on Attack of the Show to explain everything you need to know about #CISPA
https://eff.org/r.a6ae
MAY 2 @ 1:22PM

EFF asks the FCC to formally forbid cell phone shutdowns in wake of 2011 #BART incident
https://eff.org/r.3aad
MAY 2 @ 12:00PM

Twitter | Facebook | Identi.ca

**Projects**

HTTPS Everywhere
Bloggers' Rights
Coders' Rights
FOIA Project
Follow EFF
Free Speech Weak Links
Global Chokepoints
Patent Busting
Surveillance Self-Defense



EXHIBIT B



MAY 1, 2012 | BY MITCH STOLTZ

# Hollywood's Trolls

Our movie industry has created some memorable monsters on screen. But Hollywood, and the major music labels, also helped create a very real kind of monster – copyright trolls who coerce settlements from Internet subscribers using intimidation and our out-of-whack copyright laws. Last Friday, EFF Senior Staff Technologist Seth Schoen took the witness stand in AF Holdings v. Does to explain to a federal judge why BitTorrent users should be able to hold on to their constitutional rights when targeted by trolls. Although some courts have put the brakes on the trolls' schemes, there's no Hollywood ending in sight yet. As the entertainment industries continue to push for ever-stronger copyright through treaties, private agreements, Congress and state legislatures, it's time to ask – how will Hollywood help protect us from the trolls?

The current crop of copyright trolls sue anywhere from 20 to 5,000 "John Doe" defendants in a single lawsuit, pinned to a list of Internet Protocol addresses that they claim to have seen downloading copyrighted movies using BitTorrent. Then, with the courts' permission, they send subpoenas to Internet service providers for the names and addresses of subscribers. The trolls then send threatening letters, demanding settlement payments to "make this go away" or face being dragged into court – often in a faraway state. Over 200,000 U.S. residents have been caught up in these suits, with many undoubtedly settling simply to end the harassment.

The trolls are, of course, following a trail blazed by the major music labels through the Recording Industry Association of America. Beginning around 2003, they sued about 35,000 people, using the courts' subpoena powers as a private investigation service to find names and addresses. The RIAA ended its lawsuit campaign in 2008, apparently realizing the damage that suing its own fans had done to the industry's image.

It was perhaps inevitable that the vacuum would be filled by opportunists with no public image to protect. Since 2008, troll lawyers have sued about six times more people than the RIAA ever did, and pursued them even more aggressively, probably netting millions in settlements. Some have faced court settlements for cutting corners in court procedure, and one was even caught practicing law without a license. But this scheme wouldn't be a viable business model without the draconian imbalances of U.S. copyright law and legal precedent that the entertainment industries and their lobbyists have pushed through Congress and the courts.

For starters, the statutory penalty for sharing even one copyrighted work – say one song – is as much as $150,000. It's no surprise that many people choose to settle for several thousand dollars rather than risk a bankrupting court judgment – even if they broke no law. The entertainment industries insist that we need these gargantuan penalties to deter infringement, but the same "statutory damages" provisions are the knobby club in the hands of the trolls.

Then there's the legal doctrine of "secondary liability." The movie and recording industries are constantly pressing for broader liability for intermediaries, Internet sites and services, and makers of tools and software. Copyright trolls use these concepts to disregard actual copyright infringers and instead go after the owners of Internet accounts, who are often easier



to find. The trolls suggest, using the rhetoric of secondary liability, that merely allowing others to use one's Internet connection, or operating an open Wi-Fi node, makes one liable for any copyright infringement. This isn't the law, but the trolls don't warn their marks about that. Often, even those who understand secondary liability, or can afford hiring a lawyer, choose to pay a settlement for someone else's alleged infringement rather than risk a lengthy and expensive trial, even if they would prevail.

Then there's the very concept of lawsuits aimed at dozens or thousands of "John Doe" Internet account holders. Plaintiffs in these suits often group together Internet users from all over the country and obtain their identities from ISPs by court order. Doing this requires trampling on jurisdiction rules that keep people from being unfairly forced to defend themselves far from home, joinder rules that guarantee every defendant is treated as an individual, and the First Amendment, which gives us a right to communicate anonymously. The RIAA's lawsuit campaign also disregarded these legal safeguards. After the RIAA opened this door, the trolls lumbered in.

Finally, the entertainment industries have spent decades, and millions of lobbying and advertising dollars, to promote the simple but flawed idea that if copyright law promotes creativity, then ever-more-extreme copyright law will promote even more. According to this philosophy, the importance of preventing even the most inconsequential copyright infringement justifies chilling free speech, unmasking anonymous Internet users, wholesale regulation of the Internet ... and setting loose the trolls. This worldview was on full display at a hearing last week in the D.C. federal district court, when ISPs, assisted by the EFF, tried to quash subpoenas for Internet users' identities. EFF's Seth Schoen matched wits with pornography financier AF Holdings's expert on the workings of BitTorrent and Internet forensics, and the plaintiff's attorney defended his litigation tactics as an acceptable way to "stop piracy."

Although there will always be people willing to use the legal system as part of a shakedown, copyright trolls are a monster created in Hollywood. Naturally, the entertainment industry's spokespeople, lobbyists, and other mouthpieces don't discuss how the laws, treaties, court precedents, and private enforcement agreements they spend millions to promote will be misused by opportunists. But when the next SOPA, PIPA, ACTA, TPP, graduated response agreement, or state-level copyright bill comes along, let's ask Hollywood and its allies how they plan to keep trolls confined to the big screen.

Copyright Trolls

Takedown Hall of Shame

Teaching Copyright

Ways To Help

### MORE DEEPLINKS POSTS LIKE THIS

SEPTEMBER 2010
A Field Guide to Copyright Trolls

JULY 2005
Remedying Grokster

FEBRUARY 2012
What Does It Mean to be "Pro-Technology and Pro-Internet?"

DECEMBER 2009
Senator Bayh Responds on ACTA

JANUARY 2011
Fuzzy Boundaries: The Potential Impact of Vague Secondary Liability Doctrines on Technology Innovation

### RECENT DEEPLINKS POSTS

MAY 2, 2012
EFF Asks FCC to Forbid Cell Phone Shutdowns in Wake of 2011 BART Incident

MAY 2, 2012
Time to Make Warrantless Home Video Surveillance Extinct

MAY 1, 2012
Hollywood's Trolls

APR 30, 2012
Austrian Activists Push Back Against EU Data Retention Directive

APR 30, 2012
Thanks, redditors and Friends!